SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

**Department of Children & Families v. E.D.-O. (A-109-13) (073916)**

**Argued April 27, 2015 -- Decided August 20, 2015**

**CUFF, P.J.A.D. (temporarily assigned), writing for a unanimous Court.**

In this appeal concerning allegations of neglect by a parent, the Court considers, among other issues, whether N.J.S.A. 9:6-8.21(c)(4)(b) requires a finding that the parent's conduct presents an imminent risk of harm to the child at the time of fact-finding or at the time of the event that triggered agency intervention.

In May 2009, E.D.-O. left her sleeping nineteen-month-old child unattended for approximately ten minutes in a locked motor vehicle with the motor running. E.D.-O. was arrested and charged with endangering the welfare of her child. She later was released, and the police referred the matter to the Division of Child Protection and Permanency (Division). Following an investigation, a Division caseworker substantiated the allegation of neglect based on E.D.-O. leaving the child unattended in the car while she shopped in a nearby store. The Division filed a complaint against E.D.-O. and her husband, pursuant to N.J.S.A. 9:6-8.21 to -8.73 (Title 9), seeking care and supervision of their four children. E.D.-O. then filed with the Division an appeal of the substantiation of neglect finding and requested an administrative hearing. The Division denied the request pending resolution of the criminal charges and the protective services litigation. The Title 9 complaint was resolved by a consent order, and E.D.-O. renewed her administrative appeal of the substantiation determination.

On September 28, 2012, E.D.-O. filed a notice of tort claim with various State agencies, including the Division. A deputy attorney general then filed a motion seeking an order (1) summarily affirming the Division's decision to substantiate neglect against E.D.-O., and (2) denying her request for a hearing. E.D.-O. filed a cross-motion for summary disposition. On March 4, 2013, the Division Director denied E.D.-O.'s request for a hearing, granted the Division's motion for summary disposition, and ordered that E.D.-O.'s name be placed in the Central Registry, pursuant to N.J.S.A. 9:6-8.11. The Director stated that E.D.-O. failed to identify a contested fact that required an evidentiary hearing; therefore, the Director concluded that the Division was not required to forward E.D.-O.'s appeal to the Office of Administrative Law (OAL).

E.D.-O. appealed, and the Appellate Division affirmed the final agency decision substantiating neglect. 434 N.J. Super. 154 (App. Div. 2014). The appellate panel concluded that a hearing in the OAL was unnecessary because E.D.-O.'s actions plainly constituted gross neglect. The Court granted certification. 218 N.J. 530 (2014).

**HELD:** N.J.S.A. 9:6-8.21(c)(4)(b) requires a finding that the parent's conduct presents an imminent risk of harm to the child at the time of the event that triggered the Division's intervention. In addition, the determination of whether a parent's conduct is negligent or grossly negligent requires an evaluation of the totality of the circumstances, which can only occur through a hearing. The Division should have referred E.D.-O.'s appeal to the OAL for a hearing.

1. Title 9's definition of "abused or neglected child" initially looks for actual impairment to the child. Absent evidence of actual harm, the focus shifts to whether there is a threat of harm. In those circumstances, the Division must show imminent danger or a substantial risk of harm by a preponderance of the evidence. That assessment must consist of a particularized review of a parent's or caretaker's actions and the impact of any act or omission on the child. In all but the most obvious instances, that analysis must avoid resort to categorical conclusions. (pp. 14-21)

2. Whether a parent's or caretaker's decision to leave a child unattended in a home or a car constitutes neglect has been the subject of several appellate decisions. This court has emphasized that "'failure . . . to exercise a minimum degree of care'" -- the statutory foundation for a finding of neglect -- "at least requires grossly negligent or reckless conduct." Dep't of Children & Families v. T.B., 207 N.J. 294, 306 (2011) (quoting N.J.S.A. 9:6-8.21(c)(4)(b)). Appellate courts also have explained that the standard is not whether some potential for harm exists. A parent fails

to exercise a minimum degree of care when she is aware of the dangers inherent in a situation and fails adequately to supervise the child or recklessly creates a risk of serious injury to the child. (pp. 21-26)

3. Each determination of whether conduct constitutes child abuse or neglect pursuant to N.J.S.A. 9:6-8.21(c)(4)(b) requires a finding of whether the child suffered actual physical, mental, or emotional harm or whether the conduct exposed the child to an imminent risk of such harm. E.D.-O. contends that when no actual harm occurs to the child, the focus of the risk of harm is not at the time of the occurrence of the event, but at the time of fact-finding by the agency or an ALJ or a trial court. On this interpretive issue, the Court begins its inquiry with the plain language of the statute, which, in this case, is not dispositive. Moreover, the textual analysis advanced by E.D.-O. is out of step with the legislative intent of the statute, and deviates from several opinions of this Court and of the Appellate Division. Applied strictly, E.D.-O.'s focus on the risk at that time of the fact-finding has the obvious potential to overlook conduct, even aberrational conduct, that had the clear capacity to produce a catastrophic result. Such an approach contravenes the legislative determination that child protective services and a court may intervene before a child experiences actual harm. Focusing on a parent's conduct at the time of the incident does not preclude ever considering the risk of harm posed by a parent at the time of a hearing. In fact, the myriad dispositions available to the trial court after it enters a finding of abuse or neglect are fashioned based on current circumstances. (pp. 27-33)

4. The Administrative Procedure Act (APA), N.J.S.A. 52:14B-1 to –24, governs rulemaking by State agencies and provides basic ground rules for the conduct of administrative hearings in contested matters. A contested case commences when an agency renders a decision and a person seeks review of the decision. N.J.S.A. 52:14B-2(b). The agency must first determine whether the request for review constitutes a contested case. If so, the matter is forwarded to the OAL to assign an ALJ and schedule a hearing. The Division has promulgated rules governing dispute resolution. See N.J.A.C. 10:120A-1.2(a)(2). In essence, the Division has imported the summary disposition procedure utilized by the OAL, see N.J.A.C. 1:1-12.5, to perform its threshold function of identifying an appeal that requires reference to the OAL. The Court questions whether this two-step procedure was ever contemplated by the APA or is compliant with the APA's overall intent. (pp. 34-37)

5. Any allegation of child neglect in which the conduct of the parent or caretaker does not cause actual harm is fact-sensitive and must be resolved on a case-by-case basis. The treatment of this matter and others discussed in this opinion evinces a proclivity by the Division to apply a categorical rule that any parent or caretaker who leaves a young child unattended for any length of time, particularly in a motor vehicle, has failed to exercise a minimum degree of care that places the child in imminent danger of impairing that child's physical, emotional, or mental well-being. The Court continues to disapprove of the Division's resort to a categorical approach to this subset of cases. When substantiation of neglect must be determined on a case-by-case basis, there is little room for disposition of an appeal of a substantiation of neglect through the agency's self-devised summary disposition procedure. E.D.-O.'s appeal from the Division's substantiation of neglect should have been referred to the OAL, and E.D.-O. should have had the opportunity to advance all of the circumstances surrounding the event. (pp. 37-40)

6. The Court comments on the excessive amount of time that elapsed between E.D.-O.'s initial appeal of the substantiation determination, her renewed appeal following dismissal of the Title 9 complaint, and the filing of the motion for summary disposition in the Division. The Court finds the lapse of time troubling, and notes that no one -- parents, caretakers, or the public -- is served when an issue as important as whether an adult abused or neglected a child remains unresolved for years. (pp. 40-41)

7. Finally, the Court notes that enrollment in the Central Registry is a consequence of a finding of abuse or neglect. N.J.S.A. 9:6-8.11. Although the Court is mindful of the consequences of enrollment in the Registry and the duration of those consequences, it is not the function of the Court to address those seeming excesses by distorting the analysis of the underlying conduct. The Court finds that the concerns addressed by E.D.-O. and others are best addressed by the Legislature and, perhaps, the Division. (pp. 41-42)

The judgment of the Appellate Division is **REVERSED,** and the matter is **REMANDED** to the Office of Administrative Law for further proceedings consistent with this opinion.

**CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ-VINA and SOLOMON join in JUDGE CUFF's opinion.**

DEPARTMENT OF CHILDREN AND
FAMILIES, DIVISION OF CHILD
PROTECTION AND PERMANENCY,

    Petitioner-Respondent,

        v.

E.D.-O.,

    Respondent-Appellant.


    Argued April 27, 2015 - Decided August 20, 2015

    On certification to the Superior Court,
    Appellate Division, whose opinion is
    reported at 434 N.J. Super. 154 (App. Div.
    2014).

    Sean Marotta argued the cause for appellant
    (Hogan Lovells US and Epstein Arlen,
    attorneys; Mr. Marotta, Daniel N. Epstein,
    and Carol E. Matula, on the briefs).

    Erin O'Leary, Deputy Attorney General,
    argued the cause for respondent (John J.
    Hoffman, Acting Attorney General of New
    Jersey, attorney; Andrea M. Silkowitz,
    Assistant Attorney General, of counsel; Ms.
    O'Leary, and Ann Avram Huber, Deputy
    Attorney General, on the briefs).

    T. Gary Mitchell, Deputy Public Defender,
    argued the cause for amicus curiae Public
    Defender Parental Representation (Joseph E.
    Krakora, Public Defender, attorney; Mr.
    Mitchell and Robyn A. Veasey, Deputy Public
    Defender & Managing Attorney, of counsel).

1

Jeyanthi C. Rajaraman argued the cause for amicus curiae Legal Services of New Jersey (Melville D. Miller, Jr., President, attorney; Ms. Rajaraman, Mr. Miller, and Mary M. McManus-Smith, on the brief).

JUDGE CUFF (temporarily assigned) delivered the opinion of the Court.

All too frequently we hear of a parent who left a child unattended in a motor vehicle. In some instances the outcome has been tragic. Yet, even when no harm comes to the child, the parent still may be charged with a criminal offense or, if such action is warranted, the matter may be referred to the relevant child welfare agency. This is one of the latter cases.

In this appeal, on a morning in early May 2009, a mother left her sleeping nineteen-month-old child unattended for approximately ten minutes in a locked motor vehicle with the motor running in a shopping mall parking lot. The Division of Child Protection and Permanency[1] (Division) substantiated neglect, and the mother filed for an administrative review of that determination. The Division filed a complaint in the Superior Court, pursuant to N.J.S.A. 9:6-8.21 to -8.73 (Title 9), seeking care and supervision of the unattended child and her siblings. That complaint was resolved by a consent order, and

---

[1] Effective June 29, 2012, the Division of Youth and Family Services was renamed the Division of Child Protection and Permanency. L. 2012, c. 16.

2

the mother renewed her administrative appeal of the substantiation determination.

Years later, the Division determined that no genuine issue of material fact existed and summarily disposed of the matter. The Appellate Division affirmed the final agency decision substantiating neglect. The appellate panel concluded that a hearing in the Office of Administrative Law (OAL) was unnecessary because the mother's actions plainly constituted gross neglect.

Before this Court, the mother argues that in a case in which no actual harm befell the child, the Division must evaluate whether her conduct caused an imminent risk of harm to her child at the time of fact-finding, rather than at the time of the event. To do otherwise, she insists, is contrary to the plain meaning and legislative intent of the statute. Furthermore, the mother argues that requiring her name to be listed on the Central Registry[2] for a single lapse in judgment is unreasonable.

---

[2] N.J.S.A. 9:6-8.11 creates a child abuse registry that serves as "the repository of all information regarding child abuse or neglect that is accessible to the public pursuant to State and federal law." The records may be disclosed to physicians, courts, child welfare agencies, and certain employers. See N.J. Dep't of Children & Families v. A.L., 213 N.J. 1, 26 (2013) (citing N.J.S.A. 9:6-8.10a(b)(1)-(23)).

Finally, the mother insists that the Division erred and the Appellate Division compounded the error by applying a categorical approach to evaluate her actions. She maintains that the Division should have referred her appeal to the OAL for a hearing by an Administrative Law Judge (ALJ).

We reject the interpretation of the definition of abuse and neglect, N.J.S.A. 9:6-8.21(c)(4)(b), advanced by the mother that the statute requires a finding that the parent's conduct presents an imminent risk of harm to the child at the time of fact-finding rather than at the time of the event that triggered the Division's intervention. Such an interpretation is not supported by the text of the statute, the legislative history, the Court's long-standing interpretation and application of the statute, or common sense.

We also hold that the Division should have referred the mother's appeal to the OAL for a hearing. Leaving a child unattended in a car or a house is negligent conduct. However, this Court has emphasized that whether a parent's conduct is negligent or grossly negligent requires an evaluation of the totality of the circumstances. Such an evaluation can only occur through a hearing. The Division not only denied the mother a timely determination of her appeal but also denied her an individualized review of the unique circumstances attendant

4

to the incident involving her child. We therefore reverse and remand this matter for a hearing before the OAL.

I.

On the morning of May 6, 2009, E.D.-O. drove to the Dollar Tree store in the Middlesex Mall in South Plainfield with her nineteen-month-old daughter, S.O., to pick up party supplies for a birthday celebration for one of her other children. S.O. fell asleep in her car seat. Not wanting to wake her sleeping child, E.D.-O. decided to leave her asleep in the backseat of the car. She parked about 150 feet, or ten parking spaces, away from the store, left the engine running, opened both front windows slightly, and locked the doors. The sky was overcast and the temperature was about fifty-five degrees.

While E.D.-O. was in the store, a security guard noticed the running car and the sleeping child. He called the police. The security guard estimated that five or ten minutes elapsed between the time he observed the car and the arrival of the police. When E.D.-O. emerged from the store, she was confronted by a police officer. E.D.-O. indicated that she observed police activity around her car while she was paying for her merchandise. She estimated that she left her daughter unattended for less than ten minutes.

A police officer arrested E.D.-O. and charged her with endangering the welfare of her child. E.D.-O. contacted her

father, who took custody of the child.  E.D.-O. was released on her own recognizance, and the police referred the matter to the Division.

Later that day, a caseworker from the Division arrived at E.D.-O.'s home.  The caseworker reported that E.D.-O. cried during the interview and stated that she had never left this child or any of her other children unattended in a car.  She told the caseworker that she usually would leave S.O. with her parents or stay home if S.O. was sleeping.  However, E.D.-O. said, that morning, S.O. had fallen asleep on the drive to the store.  The caseworker inspected the house, finding that each child had their own bedroom, the house was clean, and there was adequate food for the family.  She also reported that S.O. was dressed appropriately and appeared to be well-nurtured.

The Division caseworker interviewed E.D.-O.'s husband and three other children, ages nine, six, and four years old.  E.D.-O.'s husband informed the caseworker that his wife had never left their children unattended before this incident.  He stated that she was a caring mother who also very capably managed his electrical business.  He told the caseworker he was confident E.D.-O. would never make this mistake again and that he believed she realized that she had made a bad decision.  The children confirmed that their parents never left them home alone.  At the conclusion of her investigation, the caseworker substantiated

6

the allegation of neglect based on E.D.-O. leaving the child unattended in the car while she shopped in a nearby store.

II.

On May 19, 2009, the Division filed a complaint in Superior Court against E.D.-O. and her husband seeking care and supervision of their four children.

On May 27, 2009, soon after the Division filed its complaint, E.D.-O. filed with the Division an appeal of the substantiation of neglect finding and requested an administrative hearing.  The Division denied the request pending resolution of the criminal charges and the protective services litigation.  On September 9, 2009, following dismissal of the Title 9 complaint pursuant to a consent order,[3] E.D.-O. renewed her request to appeal the substantiation of neglect.  Counsel for E.D.-O. sent additional letters concerning E.D.-O.'s substantiation appeal on November 9, 2009, August 12, 2010, and July 19, 2012.

On September 28, 2012, E.D.-O. filed a notice of tort claim with various State agencies, including the Division.  As the basis for E.D.-O.'s claim, the notice identified the Division's refusal to schedule a hearing, thus causing injury to E.D.-O.'s

---

[3] The record does not reveal the disposition of the criminal charge filed against E.D.-O., although there is no mention in the record of any conviction entered against E.D.-O.

reputation.  On December 3, 2012, a deputy attorney general filed a motion seeking an order summarily affirming the Division's decision to substantiate neglect against E.D.-O. and denying her request for a hearing.  E.D.-O. filed a cross-motion for summary disposition in which she noted that the Appellate Division had reached different results in various cases addressing the issue of whether leaving a child unattended constituted neglect.

On March 4, 2013, the Division Director denied E.D.-O.'s request for a hearing, granted the Division's motion for summary disposition, and ordered that E.D.-O.'s name be placed in the Central Registry.  The Director stated that E.D.-O. failed to identify a contested fact that required an evidentiary hearing; therefore, the Director concluded that the Division was not required to forward E.D.-O.'s appeal to the OAL.

E.D.-O. appealed, and the Appellate Division affirmed. Dep't of Children & Families, Div. of Child Prot. & Permanency v. E.D.-O., 434 N.J. Super. 154 (App. Div. 2014).  In so doing, it agreed that an evidentiary hearing was not required.  Id. at 157.  The panel noted that the material facts were not disputed and that the Director had properly invoked the summary disposition procedure.  Ibid.

The Appellate Division proceeded to frame the legal issue as "whether the material facts support a finding of abuse or

neglect." <u>Ibid.</u> It answered that inquiry in the affirmative, stating that

> [a]lthough there may be instances in which such an act may be fairly labeled "merely negligent," we need not describe at any length the parade of horribles that could have attended [E.D.-O.'s] neglect in concluding, as did the Director, that the act of leaving a child alone in a motor vehicle with its engine running, to enter premises 150 feet away, is a reckless act enveloped by the standard contained in <u>N.J.S.A.</u> 9:6-8.21(c)(4)(b).
>
> [<u>Id.</u> at 160.]

The Appellate Division acknowledged that the child was not harmed but emphasized that a finding of neglect often "arise[s] because of a legitimate and reasonable inference -- stemming from the act or omission in question -- that 'the child is subject to <u>future</u> danger.'" <u>Id.</u> at 159 n.5 (quoting <u>Dep't of Children & Families v. T.B.</u>, 207 <u>N.J.</u> 294, 307 (2011)).

Regarding the facts of the appeal, the panel determined that "'an ordinary reasonable person'" would have "recognize[d] the peril." <u>Id.</u> at 161 (quoting <u>G.S. v. Dep't of Human Servs.</u>, 157 <u>N.J.</u> 161, 179 (1999)). Specifically, the panel explained that "[a] parent invites substantial peril when leaving a child of such tender years alone in a motor vehicle that is out of the parent's sight, no matter how briefly." <u>Ibid.</u> The panel determined that "[E.D.-O.] recognized the danger when she felt it necessary to lock the vehicle's doors and lower both the

9

front windows by an inch." Ibid. The panel conceded however that there may be circumstances when leaving a child unattended in a motor vehicle may not run afoul of N.J.S.A. 9:6-8.21(c)(4)(b). It cited as an example a parent who left a sick and sleeping child in a car while the parent entered a pharmacy to purchase a prescription for the child. Id. at 162. Those extenuating circumstances would not be considered grossly negligent conduct as defined by section 8.21(c)(4)(b).

This Court granted E.D.-O.'s petition for certification. 218 N.J. 530 (2014).

III.

A.

E.D.-O. advances three arguments in support of her contention that the Appellate Division's judgment must be reversed.

First, she argues that a parent should not be placed on the Central Registry when the alleged act of abuse or neglect is aberrational and the parent does not pose a risk of harm to any child at the time the complaint seeking care and supervision of her children is heard or the Director renders a decision. This argument relies on a textual analysis of N.J.S.A. 9:6-8.21(c)(4)(b), New Jersey Division of Child Protection & Permanency v. M.C., 435 N.J. Super. 405 (App. Div.), certif. granted, 220 N.J. 41 (2014), to support her contention that the

10

Division is required to prove that the child has suffered actual harm or that the child remains at risk of imminent harm at the time of the fact-finding. According to E.D.-O., the facts of this case could never support a finding of neglect because the child suffered no actual harm and there was absolutely no evidence that there was any present or continuing risk of harm at the time the Director rendered her decision. E.D.-O. argues that her inclusion in the Central Registry, when her conduct posed no present or continuing risk of harm to the child, only compounds the error.

Second, E.D.-O. contends that the Director should have granted her motion for summary disposition because the Division failed to produce particularized evidence that she placed her daughter in imminent danger or subjected her to a substantial risk of harm.

Third, E.D.-O. maintains that she should have received an evidentiary hearing.

### B.

The Division urges this Court to affirm the judgment of the Appellate Division. The Division invokes the rule extending deference to agency fact-finding and interpretation of a statute the agency is charged with enforcing. The Division also urges that the finding of neglect is well supported by the record. It submits that there are no exigent or extenuating circumstances

11

that justify the action taken by E.D.-O. in this case. The Division also maintains that its disposition is consistent with well-established authority.

Furthermore, the Division urges the Court to reject E.D.-O.'s interpretation of section 8.21(c)(4)(b) that the child must be in imminent danger of becoming impaired at the time of the finding. The Division submits that the interpretation offered by E.D.-O. is contrary to established authority and that a plain reading of the statute indicates that the risk of harm posed by a parent must be evaluated at the time of the parent's abusive or neglectful conduct.

The Division also contends that an administrative hearing before the OAL was not required because no material fact was in dispute. The Division emphasizes that both parties maintained that summary disposition was appropriate to resolve the issue. The Division maintains that E.D.-O. has waived this argument because she failed to request an evidentiary hearing before the agency.

C.

Amicus curiae Office of Parental Representation of the Office of the Public Defender (OPR) urges this Court to reverse the judgment of the Appellate Division. OPR contends that E.D.-O. did not receive a full and fair hearing and that the Director applied a categorical rule. OPR contends that the record lacked

12

any particularized evidence of imminent danger to the sleeping child.

OPR also expresses concern about the litigation tactics employed by the Division. OPR argues that the Division's decision to dismiss the complaint it filed in Superior Court should preclude further litigation of the issue in a court of law or before the agency. OPR postulates that the Division may have engaged in forum shopping to assure a favorable outcome. Finally, OPR posits that "a defendant . . . will rarely ever consent to forego a fact-finding, without attempting first to secure . . . [a] withdrawal of a substantiation of neglect or abuse." As a result, the Family Part will experience an increase in litigation.

OPR also argues that the statute requires the agency or a court to address fact-sensitive claims in an evidentiary hearing. It maintains that inclusion on the Central Registry without an evidentiary hearing is contrary to the procedural protections contemplated by Title 9.

Amicus curiae Legal Services of New Jersey (LSNJ) urges this Court to reverse the Appellate Division's judgment because E.D.-O. faces the "severe, frequently life-altering effects" of being placed on the Central Registry without an adjudication from a court or even a fact-finding hearing. LSNJ also highlights four procedural flaws committed by the Division,

13

including the omission of "an evidence-based fact-finding hearing before a neutral adjudicator," the unilateral determination by the Director of "no material issue of fact," the inordinate and unjustified delay of E.D.-O.'s appeal of the substantiation decision, and the failure to clearly notify E.D.-O. and others of the effect of substantiation.

LSNJ also contends that the Appellate Division failed to consider all of the elements of N.J.S.A. 9:6-8.21(c)(4)(b), specifically, that "an act or omission . . . demonstrates reckless disregard of substantial danger," that the child's condition has been actually impaired or the child is in imminent danger of impairment, and that "a causal link [exists] between the recklessness and the 'actual or imminent' impairment." Finally, LSNJ urges this Court to provide guidance on the factors that should be considered in cases involving unattended children.

IV.

A.

In general, "Title 9 controls the adjudication of abuse and neglect cases." N.J. Div. of Youth & Family Servs. v. M.C. III, 201 N.J. 328, 343 (2010) (citing N.J.S.A. 9:6-8.21 to -8.73). This Court has explained that "[t]he purpose animating Title 9 'is to provide for the protection of children under 18 years of age who have had serious injury inflicted upon them.'" N.J.

14

<u>Div. of Youth & Family Servs. v. P.W.R.</u>, 205 <u>N.J.</u> 17, 31 (2011) (quoting <u>N.J.S.A.</u> 9:6-8.8).  Indeed, Title 9 declares that its purpose is

> to provide for the protection of children under 18 years of age who have had serious injury inflicted upon them by other than accidental means.  The safety of the children served shall be of paramount concern.  It is the intent of this legislation to assure that the lives of innocent children are immediately safeguarded from further injury and possible death and that the legal rights of such children are fully protected.
>
> [<u>N.J.S.A.</u> 9:6-8.8(a).]

Title 9's main focus is not the "culpability of parental conduct" but rather "the protection of children."  <u>G.S.</u>, <u>supra</u>, 157 <u>N.J.</u> at 177.  The sponsors of the original bill proclaimed this same focus:

> This bill recognizes that children have certain legal rights, most important of these being the right of protection from physical abuse and neglect.
>
> The purpose of this bill is to insure that these rights will be adequately protected by the appropriate courts and social service agencies.  Any proceedings under this bill will be carried out with the best interest of the child or children involved as the primary concern.
>
> [<u>S. 1217</u> (Sponsor's Statement), 196th Leg. (Apr. 29, 1974).]

Title 9 defines an "abused or neglected child," in pertinent part, as

15

> a child less than 18 years of age . . . whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian . . . to exercise a minimum degree of care . . . in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof.
>
> [N.J.S.A. 9:6-8.21(c)(4)(b).]

Accordingly, Title 9 initially looks for actual impairment to the child. However, when there is no evidence of actual harm, the focus shifts to whether there is a threat of harm. N.J. Dep't of Children & Families v. A.L., 213 N.J. 1, 22 (2013). Thus, "a finding of abuse and neglect can be based on proof of imminent danger and a substantial risk of harm." Id. at 23. Under those circumstances, "the Division must show imminent danger or a substantial risk of harm to a child by a preponderance of the evidence." Ibid. (citing N.J.S.A. 9:6-8.21(c)(4)(b), -8.46(b)). Moreover, "[c]ourts need not wait to act until a child is actually irreparably impaired by parental inattention or neglect." In re Guardianship of D.M.H., 161 N.J. 365, 383 (1999).

To find abuse or neglect, the parent must "fail[] . . . to exercise a minimum degree of care." N.J.S.A. 9:6-8.21(c)(4)(b). This Court examined the "minimum degree of care" standard in G.S.:

16

The phrase "minimum degree of care" denotes a lesser burden on the actor than a duty of ordinary care.  If a lesser measure of care is required of an actor, then something more than ordinary negligence is required to hold the actor liable.  The most logical higher measure of neglect is found in conduct that is grossly negligent because it is willful or wanton.  Therefore, we believe the phrase "minimum degree of care" refers to conduct that is grossly or wantonly negligent, but not necessarily intentional.

[G.S., supra, 157 N.J. at 178.]

The Court further explained what amounts to willful or wanton conduct:

Conduct is considered willful or wanton if done with the knowledge that injury is likely to, or probably will, result . . . .

The label turns on an evaluation of the seriousness of the actor's misconduct.  McLaughlin[ v. Rova Farms, Inc.], 56 N.J. [288,] 306 [(1970)].  Although it is clear that the phrase implies more than simple negligence, it can apply to situations ranging from "slight inadvertence to malicious purpose to inflict injury."  Id. at 305; Krauth v. Israel Geller and Buckingham Homes, Inc., 31 N.J. 270, 277 (1960) . . . .

Essentially, the concept of willful and wanton misconduct implies that a person has acted with reckless disregard for the safety of others.  Fielder[ v. Stonack], 141 N.J. [101], 123 [(1995)]; McLaughlin, supra, 56 N.J. 305. Where an ordinary reasonable person would understand that a situation poses dangerous risks and acts without regard for the potentially serious consequences, the law holds him responsible for the injuries he causes.  Ibid.  Thus, under a wanton and willful negligence standard, a person is liable for the foreseeable consequences of her

17

actions, regardless of whether she actually intended to cause injury.

[G.S., supra, 157 N.J. at 178-79.]

Therefore, the Court held that "a guardian fails to exercise a minimum degree of care when he or she is aware of the dangers inherent in a situation and fails adequately to supervise the child or recklessly creates a risk of serious injury to that child."  Id. at 181; see also T.B., supra, 207 N.J. at 306 (restating standard as "'failure . . . to exercise a minimum degree of care' requires at least grossly negligent or reckless conduct").

Abuse and neglect cases "are fact-sensitive."  T.B., supra, 207 N.J. at 309.  An analysis of a parent's conduct must account for the surrounding circumstances.  G.S., supra, 157 N.J. at 181-82 ("Whether a parent or guardian has failed to exercise a minimum degree of care is to be analyzed in light of the dangers and risks associated with the situation.").  In G.S., this Court instructed that

> the inquiry should focus on the harm to the child and whether that harm could have been prevented had the guardian performed some act to remedy the situation or remove the danger. When a cautionary act by the guardian would prevent a child from having his or her physical, mental or emotional condition impaired, that guardian has failed to exercise a minimum degree of care as a matter of law. Ultimately, we leave it to [the Division] and the courts to determine, on a case-by-case basis, whether a caregiver has failed to

18

exercise a minimum degree of care in protecting a child.

[Id. at 182.]

Failing to perform a cautionary act, however, is not necessarily abuse or neglect. T.B., supra, 207 N.J. at 306-07. Instead, to be considered abuse or neglect under N.J.S.A. 9:6-8.21(c)(4)(b), that failure must rise to the level of gross negligence. Ibid. (explaining mere negligence in failing to perform cautionary act insufficient under statute).

Furthermore, in light of the Legislature's stated intention to protect children, the focus in assessing a parent's conduct is "on the parent's level of culpability." Id. at 307. As a result, the Court has stated that

> where a parent or guardian acts in a grossly negligent or reckless manner, that deviation from the standard of care may support an inference that the child is subject to future danger. To the contrary, where a parent is merely negligent there is no warrant to infer that the child will be at future risk.

[Ibid.]

That assessment must consist of a particularized review of a parent's or caretaker's actions and the impact of any act or omission on the child. P.W.R., supra, 205 N.J. at 33. In all but the most obvious instances, that assessment must avoid resort to categorical conclusions. See T.B., supra, 207 N.J. at 309.

19

In cases where the child has not suffered actual harm, the Division must "demonstrat[e] some form of . . . threatened harm to a child." A.L., supra, 213 N.J. at 25. A.L. illustrates the rule requiring a particularized review of each situation in which the Division asserts that a parent or caretaker has neglected a child. Ibid. In A.L., the Division filed a complaint pursuant to N.J.S.A. 9:6-8.21(c)(4)(b) alleging that the mother had abused or neglected her infant, who tested positive for cocaine metabolites. Id. at 9. At the fact-finding hearing, the Division relied solely on medical records from the hospital at which the child was born and the mother's prenatal drug use to support its allegation that the mother had abused or neglected her child. Id. at 12-13. The Division conceded that it could not prove actual harm to the child. Id. at 13. However, it argued that the mother's prenatal drug use and the presence of cocaine metabolites in the infant supported a finding that the mother had exposed her child to a substantial risk of harm. Ibid.

The Court determined that "[t]he records, without more, revealed little about the degree of future harm posed to the newborn, which is the statute's critical focus in this case." Id. at 9. The Court also noted that the Division had adduced no evidence about A.L.'s behavior or the health and development of her child in the months following the child's birth. Id. at 12-

20

The Court emphasized the obligation of the Division to demonstrate "some form of actual or threatened harm to a child." Id. at 25. Ultimately, it concluded that "a report noting the presence of cocaine metabolites in [the baby's first stool], without more, does not establish proof of imminent danger or substantial risk of harm." Id. at 27-28.

B.

Whether a parent's or caretaker's decision to leave a child unattended in a home or a car constitutes neglect has been the subject of several appellate decisions. In T.B., supra, the Court examined whether a parent neglected her child when she left her sleeping four-year-old son alone in their home for over two hours. 207 N.J. at 296-97. When he awoke and could not find his mother, the child left the house. Id. at 297. He was found across the street from his home. Ibid.

In T.B., the mother contested the Division's substantiation of neglect. Id. at 299. At a hearing, she testified that she saw her own mother's car parked in the driveway and assumed her mother was at home before dropping off her son. Id. at 297-98. The child and his mother lived in the same home as the maternal grandparents, who also regularly participated in the child's care. Id. at 296-97. The Court emphasized that "'failure . . . to exercise a minimum degree of care'" -- the statutory foundation for a finding of neglect -- "at least requires

21

grossly negligent or reckless conduct." Id. at 306 (quoting N.J.S.A. 9:6-8.21(c)(4)(b)). The Court also emphasized that "the 'cautionary act' language in G.S. is informed by the grossly negligent or reckless standard that that case established. In other words, every failure to perform a cautionary act is not abuse or neglect." Ibid.

Applying that understanding of the standard articulated in N.J.S.A. 9:6-8.21(c)(4)(b), the Court concluded that the mother's conduct was not grossly negligent or reckless, id. at 309, although her conduct was certainly negligent, id. at 310. The Court explained that

> [t]his is not a situation in which she left her four-year-old son at home alone knowing there was no adult supervision. Instead, [the mother], who lived with her parents and is intimately familiar with the rhythms of their every-day-family-life, arrived at her home on a Sunday night and saw her mother's car in the driveway. She knew that her mother was always home on Sunday nights to prepare for work on Monday morning . . . . What occurred on the date in question was totally out of the ordinary. To be sure, [the mother's] failure to perform the cautionary act of calling upstairs to assure her mother's presence was clearly negligent. Under all of the circumstances known to her however, it did not rise to the level of gross negligence or recklessness.
>
> [Id. at 309-10.]

The Court therefore did not reach the issue of whether the mother's clearly negligent act posed a risk of harm to her child. Id. at 310.

In New Jersey Division of Youth & Family Services v. J.L., 410 N.J. Super. 159 (App. Div. 2009), the Appellate Division reversed a final determination by the Director of the Division of Youth & Family Services that a mother committed an act of child neglect, as defined by N.J.S.A. 9:6-8.21(c)(4)(b), when she permitted her four-year-old and six-year-old sons to leave the recreation area of the condominium development in which the family lived and enter the family home alone. Id. at 161, 174. The mother remained in the recreation area to speak with a friend but could see the boys at all times as they made their way to their home. Id. at 161. J.L. had trained the boys to leave the door, which was equipped with a child-proof cover, ajar if they entered the home without her. Ibid. However, on that day, the door closed. Ibid. The boys were unable to open it. Ibid. The older boy called 9-1-1 and the police arrived about ten minutes later. Id. at 162. Realizing that the children had not returned, the mother collected their belongings. Ibid. As she approached her home, she realized that the police were at her front door. Ibid. Between the time they left their mother and the police arrived, the children were unsupervised for approximately thirty minutes. Id. at 166.

23

In reversing the Director's final decision that the mother had committed an act of child neglect by failing to supervise her sons, the Appellate Division rejected the Division's contention that the mother's conduct rose to the level of gross negligence because of the potential of harm to the children while unsupervised. Id. at 168. The appellate panel emphasized however that "the standard is not whether some potential for harm exists. A parent fails to exercise a minimum degree of care when she is 'aware of the dangers inherent in a situation and fails adequately to supervise the child or recklessly creates a risk of serious injury to the child.'" Id. at 168-69 (quoting G.S., supra, 157 N.J. at 181).

In Department of Children & Family Services v. G.R., 435 N.J. Super. 392, 393 (App. Div. 2014), a mother left her two-year-old child asleep in a car while she entered a Target store. A police officer observed the unattended child and issued a summons to the mother when she returned five minutes later. Ibid. The Appellate Division determined that the Director erred by granting the Division's motion to proceed summarily and in concluding that the mother's conduct constituted child neglect. Id. at 399. The appellate panel noted that the existence of multiple disputed issues of fact required referring the matter to the OAL. Ibid. The panel proceeded to provide some instructions to guide the remand. Id. at 399-400. The panel

24

emphasized that whether a parent or caregiver has failed to exercise a minimum degree of care is to be "'analyzed in light of the dangers of the situation,'" id. at 400 (quoting G.S., supra, 157 N.J. at 181-82), and on a case-by-case basis, id. at 401.

In another case, the Appellate Division affirmed a substantiation of neglect by a school bus driver who left a five-year-old child asleep in a bus for over an hour. N.J. Dep't of Children & Families v. R.R., 436 N.J. Super. 53, 55 (App. Div. 2014). There, the driver did not conduct an independent inspection of the bus at the end of the route but relied on the advice of an aide known to the driver to be unreliable. Id. at 58. Following a hearing and an ALJ's recommendation that the driver's conduct could not be considered grossly negligent or reckless, the Department of Children and Families concluded that the driver's failure to personally inspect the bus at the end of the route was willful and wanton conduct. Ibid. The Appellate Division determined that the totality of the circumstances -- failing to personally inspect the bus, deferring to the advice of her unreliable aide, and leaving the young child alone on a bus on a day in which the temperature soared above ninety degrees -- fully satisfied the statutory standard of grossly negligent or reckless conduct that

created an imminent risk of harm to the sleeping child. Id. at 59-60.

To be sure, "[w]hether a particular event is to be classified as merely negligent or grossly negligent defies 'mathematical precision.'" Div. of Youth & Family Servs. v. A.R., 419 N.J. Super. 538, 544 (App. Div. 2011) (quoting G.S., supra, 157 N.J. at 178). In some instances, it is a close call. See, e.g., T.B., supra, 207 N.J. at 309. In other cases, it is not. For example, in A.R., supra, the court considered whether a father neglected his ten-month-old son who he left unattended on a twin bed without railings. 419 N.J. Super. at 543. The bed was situated next to an operating radiator. Ibid. There was evidence that the father placed some blankets to prevent the child from rolling off the bed. Id. at 545-46. Hours later, a ten-year-old child sleeping in the same room awoke to find the infant on the floor against the hot radiator. Id. at 541. The child suffered severe burns to his right cheek, head, and left arm. Id. at 540.

The Appellate Division reversed the trial court's finding that the father's conduct was merely negligent. In this case of actual harm, the panel determined that "[a]n ordinary reasonable person would understand the perilous situation in which the child was placed, and for that reason, defendant's conduct amounted to gross negligence." Id. at 546.

26

V.

Each determination of whether the conduct of a parent or caretaker constitutes child abuse or neglect pursuant to N.J.S.A. 9:6-8.21(c)(4)(b) requires a determination of whether the child suffered actual physical, mental, or emotional harm or whether the conduct exposed the child to an imminent risk of such harm. E.D.-O. argues that whether her conduct placed her child "in imminent danger of" physical, mental, or emotional harm must be assessed at the time the trial court conducts its fact-finding in the context of a complaint filed by the Division pursuant to Title 9, or at the time the agency substantiates neglect or an ALJ concludes an appeal of a Division substantiation of neglect. In other words, E.D.-O. contends that in a case in which no actual harm occurs to the child, the focus of the risk of harm is not at the time of the occurrence of the event that brought the child and the family to the attention of the Division, but at the time of fact-finding by the agency or an ALJ or a trial court. According to E.D.-O., the inquiry in a risk of harm case is whether the parent or caretaker's conduct poses a current risk of imminent harm to the child.

E.D.-O. presents, for the first time before this Court, her argument that whether her conduct exposed the child to an imminent risk of harm should be measured at the time of fact-

27

finding.  We elect to address this interpretive issue due to the need to remand this matter to the OAL for a hearing.  In instances in which the Court must engage in the interpretation of a statute, our fundamental task "is to discern and effectuate the intent of the Legislature."  Murray v. Plainfield Rescue Squad, 210 N.J. 581, 592 (2012).  We commence our inquiry with the plain language of the statute, to which we accord its ordinary meaning.  DiProspero v. Penn, 183 N.J. 477, 492 (2005).

"If the Legislature's intent is clear from the statutory language and its context with related provisions, we apply the law as written."  Shelton v. Restaurant.com, 214 N.J. 419, 429 (2013).  We turn to legislative history and other intrinsic tools to identify legislative intent when the statutory language is ambiguous, is at odds with the general statutory scheme, or the plain language leads to a result at odds with the public policy objective of the statute.  Wilson ex rel. Manzano v. City of Jersey City, 209 N.J. 558, 572 (2012).

The text of N.J.S.A. 9:6-8.21(c)(4)(b) is designed to capture grossly negligent conduct that has harmed or poses a risk of imminent harm to a child.  When the child has not suffered actual harm, the use of the present tense "is" can be interpreted to focus the fact-finder on the conduct at the time of the incident, in order to evaluate what could have occurred but for certain fortuitous circumstances.  The use of the verb

28

"is" can also be interpreted as requiring the fact-finder to concentrate on the risk of harm posed to the child at the time of formal fact-finding. The use of the verb "is" can just as likely be interpreted to require the fact-finder to evaluate the risk of harm to the child at the time of the event, at the time of fact-finding, and at the time a court fashions a remedy to prevent future harm. We therefore conclude that the use of the present tense in this definition that encompasses incidents of actual harm and risk of harm is not dispositive.

Our next inquiry is whether E.D.-O.'s position is consistent with the legislative history of Title 9. N.J.S.A. 9:6-8.21(c)(4)(b) is part of an extended definition of "abused or neglected child." It, in turn, is part of an act originally adopted in 1974 and amended several times over the years. L. 1974, c. 119. Codified at N.J.S.A. 9:6-8.21 to -8.73, the Act governs actions filed by the Division to redress conduct by parents or guardians that causes abuse or neglect to children under eighteen years of age. The overriding purpose of the statute is "'to assure that the lives of innocent children are immediately safeguarded from further injury and possible death and that the legal rights of such children are fully protected.'" State v. P.Z., 152 N.J. 86, 96-99 (1997) (quoting N.J.S.A. 9:6-8.8); accord N.J. Div. of Youth & Family Servs. v. R.D., 207 N.J. 88, 109 (2011). It has been noted that, in

focusing on the risk of harm as well as actual harm to a child from grossly negligent conduct of a parent or guardian, the Legislature sought to squash the notion of a "free pass" if the child did not suffer actual harm.  See D.M.H., supra, 161 N.J. at 383 ("Courts need not wait to act until a child is actually irreparably impaired by parental inattention or neglect.")  Thus, we conclude that the textual analysis advanced by E.D.-O. is simply out of step with the legislative intent of the statute.

E.D.-O.'s approach deviates from several opinions of this Court and the Appellate Division.  In G.S., supra, the Court addressed the "failure to exercise a minimum degree of care" language of N.J.S.A. 9:6-8.21(c)(4)(b).  157 N.J. at 177-82. The Court declared that "the phrase 'minimum degree of care' refers to conduct that is grossly or wantonly negligent, but not necessarily intentional."  Id. at 178.  Willful or wanton conduct is "done with the knowledge that injury is likely to, or probably will, result."  Ibid.

In G.S., a caretaker administered an entire bottle of medication to a child.  Id. at 168.  When his mother returned to pick up her child, he was semi-conscious.  Ibid.  When the child arrived at the hospital, he was "lethargic and pale," and "his heart rate was plummeting."  Ibid.  Although he suffered no

permanent harm, he remained hospitalized for forty-eight hours. Ibid.

The Court concluded that there was sufficient evidence to support a finding of neglect by the caretaker. Id. at 182. In so holding, the Court focused on the caretaker's conduct at the time she administered the medication. Ibid. To be sure, the physical manifestations of the overdose and the need for hospitalization may classify G.S. as an actual harm case, but the Court highlighted a "wide range of harmful conduct that all reasonable persons would characterize as neglect." Id. at 180. Among those instances of harmful conduct is leaving a two-year-old alone in a house, id. at 180-81, even though no actual harm befell the child. Finally, the Court directed that

> [w]hether a parent or guardian has failed to exercise a minimum degree of care is to be analyzed in light of the dangers and risks associated with the situation . . . . We simply remind [the Division] and the courts that the inquiry should focus on the harm to the child and whether that harm could have been prevented had the guardian performed some act to remedy the situation or remove the danger.

> [Id. at 181-82.]

T.B., supra, a case in which no actual harm befell the unattended child, applied the standard established in G.S. and followed the Court's admonition that the neglect analysis must focus on what the parent did or could have done to remove the

31

danger to the child created by the parent's conduct. 207 N.J. at 309-10. The Court focused solely on the mother's acts and omissions on the night she left her four-year-old son unattended. Ibid.

Similarly, the Appellate Division used the G.S. standard and analytical paradigm to affirm a finding that a father neglected his children by allowing their intoxicated mother to drive them home from a family vacation. Div. of Child Prot. & Permanency v. J.A., 436 N.J. Super. 61, 68-69 (App. Div. 2014). Focusing on the risk of harm to the children at the time he permitted an intoxicated person to drive a car occupied by children, the appellate panel concluded that "no reasonable person could fail to appreciate the danger of permitting children to ride in a motor vehicle driven by an inebriated driver." Ibid. The panel further concluded that the father was grossly negligent "in failing to protect the children from the imminent risk of harm." Id. at 69-70.

Thus, the position advanced by E.D.-O. to measure risk of harm to a child due to a parent's act or failure to act is out of step with both the legislative purpose of the statute and this Court's interpretation of the statute, specifically N.J.S.A. 9:6-8.21(c)(4)(b). Applied strictly, E.D.-O.'s focus on the risk the parent poses to a child at the time the incident is reviewed by a fact-finder has the obvious potential to

32

overlook conduct, even aberrational conduct, that had the clear capacity to produce a catastrophic result. Such an approach contravenes the legislative determination that child protective services and a court may intervene before a child experiences actual harm.

Focusing on a parent's conduct at the time of the incident to determine if a parent created an imminent risk of harm to a child does not preclude ever considering the risk of harm posed by a parent at the time of a hearing. Indeed, the statute contemplates not only a fact-finding hearing, but also a dispositional hearing. N.J.S.A. 9:6-8.47. The myriad dispositions available to the trial court after it enters a finding of abuse or neglect are fashioned based on current circumstances. For example, N.J.S.A. 9:6-8.50(e) expressly permits a trial court to suspend a dispositional hearing indefinitely to permit the Division to report the current status of the parent and child and whether any further services or supervision are required.

VI.

A child or a family may come to the attention of the Division in various circumstances. The police may respond to a call from a family member or neighbor expressing concerns about the well-being of a child, as in T.B.; a hospital may call the Division to report suspected child abuse or neglect, as in A.L.;

33

a school official may call the Division to recount a student's report of physical or emotional abuse or neglect, as in M.C.; or police or security personnel may encounter an unattended child in a car, as in G.R. and this appeal. If the Division determines that the circumstances warrant a substantiation of neglect,[4] the parent or caretaker may seek review of that determination. Following that appeal, the Director of the Division reviews the record and issues a final determination, which is appealable as of right to the Appellate Division. R. 2:2-3(a)(2).

The Administrative Procedure Act (APA), N.J.S.A. 52:14B-1 to -24, governs rulemaking by State agencies and provides basic ground rules for the conduct of administrative hearings in contested matters within an agency's area of responsibility. See also N.J.S.A. 52:14F-1 to -23 (establishing independent OAL for independent fact-finding in administrative disputes). A contested case commences when an agency renders a decision and a person seeks review of the decision. N.J.S.A. 52:14B-2(b). The agency must first determine whether the request for review

---

[4] N.J.A.C. 10:120A-1.3(a) defines "substantiated" as "a finding when the available information, as evaluated by the child protective investigator and supervisor, indicates by a preponderance of the evidence that a child is an abused or neglected child as defined in N.J.A.C. 10:133-1.3 because the child victim has been harmed or placed at risk of harm by a parent or guardian."

constitutes a contested case.  If so, the matter is forwarded by the agency to the OAL.  The OAL will assign the matter to an ALJ and schedule a hearing.

N.J.S.A. 52:14B-2(b) defines "contested case" as

> a proceeding . . . in which the legal rights, duties, obligations, privileges, benefits or other legal relations of specific parties are required by constitutional right or by statute to be determined by an agency by decisions, determinations, or orders, addressed to them or disposing of their interests, after opportunity for an agency hearing.

N.J.A.C. 1:1-2.1 emphasizes that a contested case is an adversary proceeding and "must be designed to result in an adjudication concerning the rights, duties, obligations, privileges, benefits or other legal relations of specific parties over which there exist disputed questions of fact, law or disposition relating to past, current or proposed activities or interests."

If a matter does not meet the APA definition of a contested case, the matter is an "uncontested case."  37 New Jersey Practice, Administrative Law and Practice § 5.15, at 254 (Steven L. Lefelt et al.) (2d ed. 2000).  The agency can retain the matter and dispose of the request for review as it considers appropriate.  Ibid.  However, an agency head may request the OAL to appoint an ALJ "to conduct an uncontested case."  N.J.A.C. 1:1-21.1(a).

The Division has promulgated rules governing dispute resolution, see generally N.J.A.C. 10:120A, which are designed to "describe the preliminary efforts provided by the Division to resolve disputes regarding . . . [a] finding of substantiated child abuse or neglect made by the Division." N.J.A.C. 10:120A-1.2(a)(2). The rules also describe the procedure for requesting formal resolution through the OAL. N.J.A.C. 10:120A-1.2(c). The Administrative Hearings Unit (AHU) is required to transmit to the OAL a request "by a perpetrator of child abuse or neglect" to review a substantiated finding of abuse or neglect, N.J.A.C. 10:120A-4.3(a)(2), unless the AHU has determined to summarily dispose of the request to dispute such a finding, N.J.A.C. 10:120A-4.3(c)(3). The Division may elect to invoke the motion for summary disposition procedure when the Director of Legal Affairs or his designee, in consultation with a representative of the Attorney General's Office, determine that there are no material facts in dispute. N.J.A.C. 10:120A-4.2(b).

Once that determination has been made, the appeal is transmitted to the Attorney General's Office "for assignment for preparation of the Motion for Summary Disposition." N.J.A.C. 10:120A-4.2(b)(1). When the motion is filed, the appellant has ten days to file exceptions. N.J.A.C. 10:120A-4.2(c)(1). If the agency head or designee determines that there are no

36

material facts in dispute, the Commissioner may deny the request for administrative review and determination as to whether the substantiation of neglect is consistent with governing law, regulations, and agency policy. N.J.A.C. 10:120A-4.2(d). If the agency head determines that material facts are in dispute, the request for an administrative hearing will be granted and the AHU will transmit the matter to the OAL. N.J.A.C. 10:120A-4.2(e).

In essence, the Division has imported the summary disposition procedure utilized by the OAL, see N.J.A.C. 1:1-12.5, to perform its threshold function of identifying an appeal that requires reference to the OAL. Given the APA's definition of a "contested case," N.J.S.A. 52:14B-2(b), we question whether this two-step procedure was ever contemplated by the APA or is compliant with the APA's overall intent to allow citizens the opportunity to fully and fairly contest administrative agency determinations that are grounded in factual applications of an agency's enabling statute. This two-step procedure may have also contributed to the wholly unacceptable time it has taken in some instances to dispose of appeals from substantiation decisions by the Division.

VII.

Any allegation of child neglect in which the conduct of the parent or caretaker does not cause actual harm is fact-sensitive

37

and must be resolved on a case-by-case basis. The antithesis of a case-by-case review is an agency determination that certain conduct poses an imminent risk of physical, emotional, or mental harm to a child without regard to the circumstances at the time of the conduct. The treatment of this matter, as well as others discussed in this opinion, evinces a proclivity by the Division to apply a categorical rule that any parent or caretaker, who leaves a young child unattended for any length of time, particularly in a motor vehicle, has failed to exercise a minimum degree of care that places the child in imminent danger of impairing that child's physical, emotional, or mental well-being. Yet, in all but one of the cases discussed involving an unattended child, see G.R., supra, 435 N.J. Super. at 401-02, the parent or caretaker received an evidentiary hearing before an ALJ, see R.R., supra, 436 N.J. Super. at 55-56; J.L., supra, 436 N.J. Super. at 164-65, or the trial court conducted an evidentiary hearing to adjudicate a complaint filed by the Division pursuant to N.J.S.A. 9:6-8.21 to -8.73, see A.R., supra, 419 N.J. Super. at 540. In the one exception, G.R., supra, an appellate panel held that the agency erred by proceeding summarily. 435 N.J. Super. at 399. We have expressly disapproved and continue to disapprove of the Division's resort to a categorical approach to this subset of cases.

To be sure, E.D.-O. filed a cross-motion for summary disposition in response to the motion filed by a deputy attorney general. The record supported a determination that no material fact was disputed only if a categorical rule applied to unattended children cases. E.D.-O.'s submission emphasized the aberrational nature of the single incident. In short, the essence of E.D.-O.'s position was that the totality of the circumstances precluded a finding that she had acted in any way that created an imminent and substantial risk of harm to her sleeping toddler.

This Court and the Appellate Division have identified circumstances when a child has been left unattended that may compel a finding of inattentiveness or even negligent conduct, but certainly do not rise to the level of grossly negligent conduct. For example, in G.R., supra, the Appellate Division identified seven circumstances that should be considered in evaluating a parent's conduct in such situations. 435 N.J. Super. at 399. Those factors included the distance between the store and the parked car, the mother's ability to keep the car in sight, how long the car was out of view, how long the child remained unattended, and any extenuating circumstances. Ibid. We note that the weather on the day the child is left unattended and the ability of someone to enter the vehicle are also relevant considerations. In other words, when substantiation of

39

neglect must be determined on a case-by-case basis, there is little room for disposition of an appeal of a substantiation of neglect through the agency's self-devised summary disposition procedure.

E.D.-O.'s appeal from the Division's substantiation of neglect should have been referred to the OAL. She should have had the opportunity to advance all of the circumstances surrounding the event. Those circumstances include but are not limited to the actual distance between the vehicle and the store, her ability to keep the vehicle in view, the length of time she left the child unattended, the number of vehicles and persons in the area, the ability to gain access to the interior of the car, and the temperature inside and outside the car.

We would be remiss if we did not comment on the excessive amount of time that elapsed between E.D.-O.'s initial appeal of the substantiation determination, her renewed appeal following dismissal of the Title 9 complaint, and the filing of the motion for summary disposition in the Division. The lapse of time is troubling. Approximately three years and four months elapsed before the motion was filed, and that appears to have been initiated by a notice of tort claim. No person who has been aggrieved by agency action should have to resort to such measures to have an appeal resolved.

No one -- parents, caretakers, or the public -- is served when an issue as important as whether an adult abused or neglected a child remains unresolved for years. Inordinate delay in resolving substantiation appeals also takes on the specter of the absurd when, as in this case, the child was nineteen months old at the time of the underlying event, four years old when the Director finally issued her decision, and will be almost eight years old when the matter is remanded for a hearing before an ALJ.

Finally, we observe that whether a parent's or caretaker's conduct causes an imminent risk of harm is evaluated through the lens of the statutory standard as interpreted and applied by the Court, rather than through the lens of the consequences of a finding of neglect, specifically, enrollment in the Central Registry. Enrollment in the Registry is a consequence of a finding of abuse or neglect. N.J.S.A. 9:6-8.11. We are mindful of the consequences of enrollment in the Registry and the duration of those consequences. We are aware that for some acts, enrollment in the Registry may seem draconian. See W. Todd Miller, The Central Registry Statute for Abuse and Neglect Matters is Constitutionally Flawed, 8 Rutgers J.L. & Pub. Pol'y, 651, 652 (2011). However, it is not the function of this Court to address those seeming excesses by distorting the analysis of the underlying conduct. The concerns addressed by E.D.-O. and

41

others are best addressed by the Legislature and, perhaps, the Division.

## VIII.

The judgment of the Appellate Division is reversed and the matter is remanded to the OAL for further proceedings consistent with this opinion. We do not retain jurisdiction.


CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ-VINA and SOLOMON join in JUDGE CUFF's opinion.

SUPREME COURT OF NEW JERSEY

NO.      A-109                          SEPTEMBER TERM 2013

ON CERTIFICATION TO      Appellate Division, Superior Court


DEPARTMENT OF CHILDREN AND
FAMILIES, DIVISION OF CHILD
PROTECTION AND PERMANENCY,

        Petitioner-Respondent,

                v.

E.D.-O.,

        Respondent-Appellant.


DECIDED           August 20, 2015
                Chief Justice Rabner                    PRESIDING
OPINION BY          Judge Cuff (temporarily assigned)
CONCURRING/DISSENTING OPINIONS BY
DISSENTING OPINION BY

| CHECKLIST | REVERSE AND REMAND | |
|---|---|---|
| CHIEF JUSTICE RABNER | X | |
| JUSTICE LaVECCHIA | X | |
| JUSTICE ALBIN | X | |
| JUSTICE PATTERSON | X | |
| JUSTICE FERNANDEZ-VINA | X | |
| JUSTICE SOLOMON | X | |
| JUDGE CUFF (t/a) | X | |
| TOTALS | 7 | |